UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DAVID DARNELL NELSON, JR.,

          Plaintiff,

v.                                               Case No. 19-cv-510-pp

CAPTAIN GEGARE, *et al.*,

          Defendants.

**ORDER SCREENING SECOND AMENDED COMPLAINT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DISCOVERY, COURT REVIEW OF VIDEO AND SPEEDY TRIAL (DKT. NO. 40)**

On April 14, 2020, the court screened the plaintiff's amended complaint, determined that it did not clearly state a cognizable claim under 42 U.S.C. §1983 and ordered him to file a second amended complaint by May 15, 2020. Dkt. No. 36. The court instructed the plaintiff to list all the defendants against whom he wished to proceed in this lawsuit and to include in his second amended complaint all his allegations against those people. Id. at 6–7. The court described the information that the plaintiff needed to include in his second amended complaint to proceed on a claim that prison officials took him in and out of protective custody without providing adequate mental health treatment. Id. at 7–8. The court received the second amended complaint on April 24, 2020. Dkt. No. 37.

1

## I. Second Amended Complaint (Dkt. No. 37)

### A. The Plaintiff's Allegations

The plaintiff did not follow the court's instructions in filing his second amended complaint. The plaintiff did not use the court's complaint form (a blank copy of which the court sent him with the April 2020 order). The second amended complaint does not list all the defendants the plaintiff seeks to sue. The second amended complaint simply starts relating facts—it begins with, "To be specific, Gegare told me to kill myself for writing a sexuall harassment grievance." Dkt. No. 37 at 1. The plaintiff names various individuals throughout the four-page complaint. The court assumes that the individuals whom the plaintiff names in the second amended complaint are the individuals he wants to sue.

The plaintiff was incarcerated at the Green Bay Correctional Institution, when he filed his complaint, but his allegations involve events that occurred while he was incarcerated at the Milwaukee Secure Detention Facility (MSDF). Dkt. No. 37 at 4. He alleges that sometime between May and July 2018, he was taking a shower, and Captain Gegare watched him shower and sexually harassed him by calling him derogatory names and slurs. Id. at 1. The plaintiff covered his window with paper to keep Gegare from being able to watch him shower. Id. Gegare became upset and ordered the plaintiff to remove the paper or else "he [would] take all [the plaintiff's] legal paper and other paper." Id. The plaintiff told Gegare to "get away from [the plaintiff's] cell window" or the plaintiff would call the Prison Rape Elimination Act (PREA) hotline. Id. Gegare

2

"didn't back off" and "played mind games" with the plaintiff, including telling him that Dr. McLean (who is not a defendant) wanted to speak with the plaintiff about sending him to the emergency room for ulcers. Id. The plaintiff finished showering and went to the Health Services Unit to speak with Dr. McLean. Id. He says, however, that Dr. McLean "didn't say a word to [him]." Id.

The plaintiff says that "they" sent him back to his cell in the segregated housing unit on the fifth floor. Id. The plaintiff noticed that all paper had been taken from his cell, and he saw "Gegare smiling as if it was funny taking [the plaintiff's] paper." Id. The plaintiff says he became "emotional distressed" and passively resisted by sitting on the floor of the segregation housing unit next to his cell and refusing to go in. Id. He says this is when Gegare used "excessive force" on him, as if he was "aggressive restaning." Id.

The plaintiff alleges that Correctional Officers Flemming, McWilliam, Pulage and unnamed officers allegedly assaulted him by slamming his chest and face on the floor—he says that Pulage was on his back, pushing his knees into the plaintiff's back and that Flemming and McWilliams picked him up in the air and slammed him on the ground. Id. at 2. The plaintiff asserts that Gegare "was holding [him] in a head lock" before the other officers started their attack. Id. The plaintiff says that next, Gegare told Lieutenant Ackerman "to finish the excessive use of force on [the plaintiff]." Id. Ackerman told McWilliam and the others to place the plaintiff in a "sui[]cidal chair and strap [him] down

3

as if [he] was sui[]cidal," even though the plaintiff asserts that he was not suicidal at that time. Id.

The plaintiff recounts that he was screaming, telling the officers to stop and let him out of the chair; Ackerman told him to stop resisting before using a taser on the plaintiff's leg. Id. The plaintiff describes this as "the worse pain [he] ever felt in [his] life." Id. He says his legs were bleeding and swollen, and he could smell his flesh burning. Id. The plaintiff says his chest hurt and he was in such severe pain that he cried. Id. The officers put the plaintiff in an observation cell, in the chair and strapped down. Id. The plaintiff says that when they released him from "control status or o[b]servation cell," he called "777 and 888" to report Gegare's sexual harassment, assault and retaliation. Id.

At some point, "they" released the plaintiff from segregation to general housing on the sixth floor. Id. The plaintiff says he kept having flashback memories of Gegare telling him to kill himself and watching him shower, harassing him and using excessive force on him, as well as of Ackerman tasing him. Id. So, the plaintiff says, he tied together two bedsheets and a blanket and attempted to hang himself over the second story tier in the prison. Id. An unnamed supervisor stopped the plaintiff from hanging himself, and "they" took the plaintiff to a hospital. Id.

When the plaintiff returned from the hospital, "they" put him on protective confinement. Id. at 3. While on protective confinement, Ackerman and Gegare "call[ed him] out" for the PREA report he had lodged against

4

Gegare. Id. The plaintiff states that Gegare and Ackerman investigated him and denied his PREA complaint "or examination." Id. Gegare moved the plaintiff to a general population cell but put his protective confinement information on his cell door. Id. The plaintiff alleges that, in retaliation for his PREA complaint against Gegare, Gegare put the plaintiff in a top tier cell, even though the plaintiff had a bottom tier medical restriction. Id. The plaintiff notes that he'd filed a failure to protect claim based on an earlier instance. Id. He says that Gegare continued to refer to the plaintiff by slurs and names and continued to tell the plaintiff to kill himself because the plaintiff is bisexual. Id. He states that Gegare, Ackerman, McWilliam "and the other defendants insult [his] sexual orientation and gender identity." Id.

On July 16, 2018, the plaintiff's cell door "open up without supervisor to protect me." Id. The bottom of this page of the second amended complaint is cut off, and the remaining lines on the page have been obscured. Id. The plaintiff alleges that he was in his cell naked, "ready to give Gegare what he want, me to kill my self." Id. at 4. The plaintiff alleges that Gegare was telling him to kill himself, so he climbed to the top of the second story tier in the prison and jumped off. Id. Officer Johnson (who the court assumes is not a defendant) told the plaintiff not to jump, but Gegare encouraged him to jump. Id. The plaintiff says he "jumped off the tier hard so hard that [he] was in pain and dizzy." Id. The plaintiff says that "The Authority" did not send him to the emergency room but instead placed him, still naked, into an observation cell. Id.

5

The plaintiff alleges that sometime in September 2018, while he was on protective custody, Gegare and Flemming opened the plaintiff's cell door while other inmates were out of their cells "for day room," and two inmates assaulted him. Id. at 3. The plaintiff says he grieved the officers' actions but does not provide the result of the grievance. Id.

The plaintiff says has been diagnosed with borderline personality disorder, depression, posttraumatic stress disorder, schizophrenia, bipolar and paranoid disorder, panic disorder "and many more by history." Id. at 4. He states he is supposed to receive psychotherapy and counseling, but those services are not offered in the MSDF. Id. He says MSDF staff removed him from protective custody because "they are aware that [he] cant control [his] illnesses and [he] will harm [himself] or others will harm [him]." Id. He states that Gegare and unspecified others are retaliating against him for filing this lawsuit. Id. The plaintiff does not state what relief he seeks (although again, the last lines of the final page of the filing have been cut off).

B.  Analysis

There are several potential claims in the second amended complaint. The plaintiff first states that Captain Gegare took his papers and legal papers from his cell because the plaintiff covered his cell window with paper so Gegare could not watch him shower. These allegations sound like a claim that Gegare retaliated against the plaintiff. To state a claim of retaliation under the First Amendment, the plaintiff must allege that "he engaged in a protected activity, he suffered a deprivation likely to prevent future protected activities, and there

6

was a causal connection between the two." Felton v. Huibregtse, 525 F. App'x 484, 486 (7th Cir. 2013) (citing Watkins v. Kasper, 599 F.3d 791, 794 (7th Cir. 2010), and Bridges v. Gilbert, 557 F.3d 541, 546 (7th Cir. 2009)). "[P]rotected activity" includes the filing of grievances or lawsuits about prison officials or prison conditions. See, *e.g.*, Pearson v. Welborn, 471 F.3d 732, 741 (7th Cir. 2006) (inmate complaints or grievances); Harris v. Walls, 604 F. App'x 518, 521 (7th Cir. 2015) (federal lawsuits).

The plaintiff's action of covering his window for privacy, however, is *prohibited*, not protected, conduct. See MSDF Inmate Handbook 2018–2020, available at https://doc.wi.gov/Documents/OffenderInformation/ AdultInstitutions/MSDFEnglishHandbook.pdf, at 9 ("'Privacy curtains' are not allowed to be affixed to any portion of your cell. (I.e. windows, door, bed frame, desk, locker, bars, ceiling, sprinkler heads, walls or vents). This is not allowed at any time for any reason."). Taking the papers and legal papers from the plaintiff's cell may not have been an appropriate response to the plaintiff covering his window but it was not an act of retaliation actionable under the First Amendment. The plaintiff has not stated a claim of retaliation against Gegare for taking his papers.

The plaintiff next states that Gegare, Flemming, McWilliams, Pulage and Ackerman used excessive force while restraining him and moving him to a suicide chair and observation cell. The Eighth Amendment protects a prison inmate from cruel and unusual punishments. See generally Wilson v. Seiter, 501 U.S. 294 (1991). "[T]he unnecessary and wanton infliction of pain . . .

7

constitutes cruel and unusual punishment forbidden by the Eighth Amendment." Hudson v. McMillian, 503 U.S. 1, 5 (1992) (quoting Whitley v. Albers, 475 U.S. 312, 319 (1986)). An Eighth Amendment claim has an objective and a subjective component. Farmer v. Brennan, 511 U.S. 825, 834 (1994). In the context of a claim of excessive force, the plaintiff must show both that (1) "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation," [the objective component] and (2) "'the officials act[ed] with a sufficiently culpable state of mind.'" [the subjective component]. Hudson, 503 U.S. at 8 (quoting Wilson, 501 U.S. at 298, 303). The "core judicial inquiry" is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Id. at 6 (citing Whitley, 475 U.S. at 320–21).

The plaintiff alleges that he was passively refusing to enter his segregated housing cell by sitting on the floor. He says he was not resisting and was not being aggressive. The officers allegedly responded by holding him in a headlock, pushing their knees into his back, slamming his face into the floor and using a taser on him. These actions are "harmful enough" to constitute excessive force. At this early stage, viewing the plaintiff's allegations in the light most favorable to him, the court will allow the plaintiff to proceed on an Eighth Amendment claim of excessive force against Gegare, Flemming, McWilliams, Pulage and Ackerman.

The plaintiff next states that unknown officers left his cell door open, allowing him to climb out to the second story tier to attempt to kill himself. He

8

states that Gegare encouraged the plaintiff to jump from the second story, but he does not state who left his door open. The plaintiff also alleges that in September 2018, Gegare and Flemming left open the plaintiff's cell door and that two inmates entered his cell and attacked him. These allegations amount to a claim that the defendants failed to protect him from harm—a form of deliberate indifference, which also arises under the Eighth Amendment's prohibition against cruel and unusual punishments. See Estelle v. Gamble, 429 U.S. 97, 104 (1976); Farmer, 511 U.S. at 832–33 (noting that prison officials "must take reasonable measures to guarantee the safety of the inmates" and "to protect prisoners from violence at the hands of other prisoners").

To state a claim of deliberate indifference, the plaintiff must show that he "is incarcerated under conditions posing a substantial risk of serious harm." Farmer, 511 U.S. at 834. It is not enough to demonstrate "a generalized risk of violence." Wilson v. Ryker, 451 F. App'x 588, 589 (7th Cir. 2011) (citing Brown v. Budz, 398 F.3d 904, 909, 913 (7th Cir. 2005)). The plaintiff instead must show that there was "a tangible threat to his safety or well-being" or, in other words, a risk "so great that it is almost certain to materialize if nothing is done." Id. (citing Grieveson v. Anderson, 538 F.3d 763, 777 (7th Cir. 2008) and Brown, 398 F.3d at 911 (internal quotations omitted)). The plaintiff also must demonstrate that the officials acted with the requisite intent, that is, that they had a "sufficiently culpable state of mind." Farmer, 511 U.S. at 834. A prison official cannot be found liable under the Eighth Amendment unless he

9

subjectively knows of an excessive risk of harm to an inmate's health or safety and disregards that risk. Id. at 837; Perez v. Fenoglio, 792 F.3d 768, 776 (7th Cir. 2015). "[A]n official's failure to alleviate a significant risk that he should have perceived but did not" does not amount to cruel and unusual punishment. Farmer, 511 U.S. at 838. "Because a prison official's duty under the Eighth Amendment is to ensure 'reasonable safety,' prison officials who actually knew of a substantial risk to inmate health or safety can nevertheless escape liability if they responded reasonably to the risk, whether or not the harm was ultimately averted." LaBrec v. Walker, 948 F.3d 836, 841 (7th Cir. 2020) (quoting Farmer, 511 U.S. at 844-45).

Regarding the July 16, 2018 incident, the plaintiff alleges that his "cell door open[ed] up" but does not say who opened his cell door or whether any officer intentionally opened it. Once he left his cell, Gegare allegedly told the plaintiff to jump from the second story tier. The plaintiff did jump, although the plaintiff does not describe the extent of any injuries he suffered. In most cases, verbal harassment alone does not constitute a violation of the Eight Amendment. See DeWalt v. Carter, 224 F.3d 607, 612 (7th Cir. 2000) ("The use of derogatory language, while unprofessional and deplorable, does not violate the Constitution."), abrogated in part on different grounds by Savory v. Cannon, 947 F.3d 409, 423–24 (7th Cir. 2020) (*en banc*). Gegare's insults and use of slurs and names, while unacceptable and unprofessional, did not violate the Eighth Amendment. But Gegare allegedly did more. The plaintiff alleges that Gegare provoked a known suicidal inmate to leap from the second story of

10

a prison, after having encouraged him for days or weeks to kill himself because of his sexual orientation. If these allegations prove true, Gegare's actions posed an excessive risk to the plaintiff's safety. See Lisle v. Welborn, 933 F.3d 705, 718 (7th Cir. 2019) (distinguishing DeWalt and concluding that nurse's alleged taunts and encouragement to suicidal inmate to take his own life "went beyond 'simple verbal harassment'" and was actionable under Eighth Amendment). The plaintiff may proceed on an Eighth Amendment claim against Gegare for encouraging the plaintiff to harm himself.

The plaintiff has not stated an Eighth Amendment claim regarding the September 2018 incident. The plaintiff alleges that Gegare and Flemming opened his cell door while he was on protective confinement and while other inmates were out of their cells and that two inmates assaulted the plaintiff. The plaintiff does not allege that Gegare or Flemming were aware that the plaintiff was at a heightened risk of violence from other inmates. The plaintiff says he was placed on protective custody to protect him *from himself*. He has not alleged that he previously had been attacked or that he had communicated to Gegare and Flemming a specific, articulable risk to his health or safety from other inmates if his cell door were left open. He alleges only a general, theoretical risk of harm. That the risk happened to materialize may show negligence by Gegare and Ackerman (although the court is not finding that they were negligent), but neither negligence nor gross negligence is enough to support an Eighth Amendment claim. See Farmer, 511 U.S. at 835–36; Chapman v. Keltner, 241 F.3d 842, 845 (7th Cir. 2001). Without alleging that

Gegare and Flamming had actual knowledge of a concrete risk of harm to the plaintiff, the plaintiff cannot proceed against Gegare and Flemming on a claim of deliberate indifference/failure to protect.

The plaintiff states that Gegare and Ackerman retaliated against him for filing a PREA complaint against Gegare by placing him in a top tier cell despite his medical restriction for a bottom tier. Filing a complaint is protected activity. The plaintiff also alleges that Gegare and Ackerman "called out" the plaintiff for filing the complaint, denying the PREA complaint and moving him to the top tier. Those allegations show the necessary causal connection between the protected activity and the act of retaliation. That leaves only the question whether the officers' actions were reasonably likely to deter future protected conduct. This standard is objective, so the fact that the plaintiff continued to file complaints against the officers "does not undermine his claim." Douglas v. Reeves, 964 F.3d 643, 646 (7th Cir. 2020) (citing Holleman v. Zatecky, 951 F.3d 873, 880 (7th Cir. 2020)).

The Court of Appeals for the Seventh Circuit has noted that an officer's act of moving an inmate from one cell to another is "not enough to launch and sustain a First Amendment claim." Douglas, 964 F.3d at 647. But the plaintiff alleges that Gegare and Ackerman moved him to another *tier* within the prison, not just another cell, and that the officers moved him to an upper tier despite knowing he had a medical restriction designating him to the lower tier. While it is a close call, the court will allow the plaintiff to proceed against Gegare and

12

Ackerman on his claim that moving him to an upper tier cell constituted retaliation.

The plaintiff also asserts that Gegare and Flemming were retaliating against him when they opened his cell door, resulting in two inmates attacking him. The plaintiff does not allege a causal connection between the officers' action and his protected conduct. He alleges only that the door-opening incident occurred after he filed the PREA complaint against Gegare. To prove a causal connection, the plaintiff must show more than that the defendants' actions occurred after his protected activity. He must show that the defendants had actual knowledge of his protected conduct and acted because of it. See Healy v. City of Chi., 450 F.3d 732, 740–41 (7th Cir. 2006). In other words, the plaintiff must show that the protected activity "was the but-for cause" of the adverse action. Winston v. Fuchs, No. 20-1643, 2020 WL 7230248, at *2 (7th Cir. Dec. 8, 2020) (citing Nieves v. Bartlett, ___ U.S. ___, 139 S. Ct. 1715, 1722 (2019) (explaining that the official's retaliatory motive "must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive")). Although Gegare knew the plaintiff had filed the PREA complaint against him, the plaintiff does not allege that Flemming knew about it. Nor does he allege that Gegare and Flemming opened his door *because* he filed the complaint. He alleges only that they opened his door after he had filed the complaint. The plaintiff has not stated a claim of retaliation against Gegare and Flemming for opening his door in September 2018.

13

The court will allow the plaintiff to proceed on the following claims: 1) an Eighth Amendment claim of excessive force against Gegare, Flemming, McWilliams, Pulage and Ackerman; 2) an Eighth Amendment failure-to-protect claim against Gegare; and 3) a First Amendment claim of retaliation against Gegare and Ackerman. The court will dismiss all other defendants because the plaintiff does not name them in his second amended complaint or allege any actions by those defendants.

## II.   Plaintiff's Letter Motion (Dkt. No. 40)

On December 29, 2020, the court received from the plaintiff a letter in which he requested several different forms of relief. Dkt. No. 40. The letter stated that the plaintiff "want[ed] a motion for Summary Judgment and a motion for a Discovery of everything that happen in [his] case with video of the fail to protect in[c]ident." Id. at 1. He also stated that he wanted a motion for the "courts to watch the video of everything that happen to me in MSDF in Segregation Housing Unit on June or July 16 2018." Id. The plaintiff said that he would like a motion "for a 90 day speeding trail," and asserts that the defendants "are not trying to settle with [him] for fail to protect [him] in MSDF." Id. at 2.

The court will deny the plaintiff's requests. This case is in the very early stages—the defendants do not yet know that the plaintiff has sued them. The next step is for the court to serve the complaint and this order on the defendants and to require them to answer or respond to the plaintiff's allegations. After the defendants have responded, the court will set deadlines

14

for the parties to conduct discovery and to file motions for summary judgment. During discovery, the plaintiff may ask the defendants questions about his allegations and request evidence from them, including the video of the incident. In a future order the court will provide the plaintiff with more information about conducting discovery. After the parties have finished the discovery process, they may move for summary judgment. The court also will provide the plaintiff with more information about summary judgment in the future order. If the parties provide the court with the video of the incident as part of the summary judgment pleadings, the court will watch the video.

Because this is a civil case, and not a criminal prosecution, the plaintiff is not entitled to a speedy trial; the Speedy Trial Act, 18 U.S.C. §3161, applies only in criminal prosecutions. The court will conduct a trial in this case only if there are genuine disputes as to any material facts about the plaintiff's allegations; the court won't know whether there are any genuine disputes of material fact until after it has reviewed and decided the summary judgment motions.

Right now, there is nothing for the plaintiff to do but wait. Either the defendants will file a motion to dismiss the case—in which case the court will give the plaintiff a deadline by which to respond to that motion—or the defendants will file an "answer" to the complaint—in which case the court will issue a scheduling order. The court will advise the plaintiff of any future deadlines.

### III. Conclusion

The court **DISMISSES** Security Director Miller, Gordon, Dr. Abrams, Deputy Warden Roman, Mr. Malone, CO Miller, McLain (or McClain), Supervisor Thomas Salter, P.S.U. Stuward, Dr. Plato, Ms. Tunnell, Sgt. Morales and Supervisor Dollor.

The court **DIRECTS** the Clerk of Court to update the spelling on the docket from "CO Powledge" to "CO Pulage" and "CO McWilliam" to "CO McWilliams."

The court **DENIES** the plaintiff's letter motion for summary judgment, discovery and a speedy trial. Dkt. No. 40.

Under an informal service agreement between the Wisconsin Department of Justice and this court, a copy of the complaint and this order have been electronically transmitted to the Wisconsin Department of Justice for service on defendants Captain Gegare, Correctional Officer Flemming, Correctional Officer McWilliams, Correctional Officer Pulage and Lieutenant Ackerman. Under the informal service agreement, the court **ORDERS** those defendants to file a responsive pleading to the complaint within 60 days.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for discovery and dispositive motions.

The court **ORDERS** that plaintiffs who are inmates at Prisoner E-Filing Program institutions must submit all correspondence and case filings to institution staff, who will scan and e-mail documents to the court. Plaintiffs

16

who are inmates at all other prison facilities must submit the original document for each filing to the court to the following address:

> Office of the Clerk
> United States District Court
> Eastern District of Wisconsin
> 362 United States Courthouse
> 517 E. Wisconsin Avenue
> Milwaukee, Wisconsin 53202

DO NOT MAIL ANYTHING DIRECTLY TO THE JUDGE'S CHAMBERS. It will only delay the processing of the case.

The court advises the plaintiff that if he fails to file documents or take other required actions by the deadlines the court sets, the court may dismiss the case based on his failure to diligently pursue it. The parties must notify the clerk of court of any change of address. The court also advises the plaintiff that it is his responsibility to promptly notify the court if he is released from custody or transferred to a different institution. The plaintiff's failure to keep the court advised of his address may result in the court dismissing the case without further notice.

Dated in Milwaukee, Wisconsin, this 10th day of February, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**